**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

MS BANK S.A. BANCO DE CAMBIO,

        Plaintiff,

v.                                                Case No. 20-04049-JWB

CBW BANK,

        Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on Plaintiff's Motion for a Temporary Restraining Order ("TRO") (Doc. 3). The court held a telephonic hearing ("Hearing") on the motion on September 10, 2020, at which all parties appeared. At the conclusion of the hearing, the court denied the motion for TRO and informed the parties that this written order would follow. For the reasons stated herein, along with the reasons stated on the record at the hearing, Plaintiff's motion is DENIED.

**I.  Background and Facts**

The foregoing facts are taken from Plaintiff's complaint and memorandum. (Docs. 1, 4.) Plaintiff, MS Bank S.A. Banco de Cambio ("MS"), is a Brazilian bank specializing in wire transfers between the United States and Brazil. Defendant, CBW Bank, is a single-branch bank in Weir, Kansas, that services foreign banks and money transmitting businesses. In January 2018, MS opened a correspondent account with CBW after signing a Wire and ACH Services Agreement ("Services Agreement"). The Services Agreement lists MS's obligations as a CBW accountholder,

including a minimum monthly fee of $10,000.  The Services Agreement contains both a *force majeure* clause and a termination clause.  The *force majeure* clause provides:

> If a party is prevented, hindered, or unavoidably delayed from or in performing any of its obligations under this Agreement by an event beyond its reasonable control, such as compliance with a law or governmental order, strike of workers, lock-out, labor dispute, act of God, earthquake, fire, flood, war, riot, civil unrest, malicious damage, or other circumstances interrupting the operation of the United States or international banking system (individually and together, a "Force Majeure Event"), that party shall not be obliged to perform its obligations under this MOU *only to the extent that it is actually prevented, hindered, or unavoidably delayed in its performance by the Force Majeure Event*; provided, however, that such party declaring a Force Majeure Event shall notify the other party immediately upon the termination of the Force Majeure Event, and such declaring party shall make all commercially reasonable efforts to resume performance immediately thereafter.

(Doc. 1-2 at ¶ 7) (emphasis added).  The pertinent section of the termination clause states:

> (a) Bank may terminate this Agreement at any time upon thirty (30) days prior notice to Customer. However, a notice period shall not be required in the event that Bank is advised, either officially or unofficially, by any Regulatory Authority to cease operation of wire services. (b) Customer may terminate this Amendment at any time upon thirty (30) days prior written notice to Bank. Notice to terminate shall not be valid until all outstanding fees and obligations are brought current. (c) Upon termination of this Agreement, Bank shall have no obligation to Clear any wire services under this Agreement.

(Doc. 1-2 at ¶ 9.)

Throughout the parties' relationship, MS kept the account in good standing and made its monthly payments.  At times CBW advised MS of requirements imposed on the account by CBW's regulators, with which MS complied in order to maintain a proper business relationship.  MS further provided all required due diligence information on a transaction basis in order to comply with regulations.  However, on July 23, 2020, a CBW employee forewarned Ticiane Galeazzi, MS's Chief Operating Officer, that CBW planned on closing MS's account.  The following day CBW provided written notice of termination and stated the account would be closed at the end of business on September 11, 2020.  Attempting to dissuade CBW from closing the account, on

2

August 7, 2020, MS sent a letter asking for an extension of time and gave notice that the current coronavirus pandemic constituted a *force majeure* event under the Services Agreement. Nevertheless, on August 23, 2020, CBW replied with a letter stating that it planned on moving forward with terminating the relationship on September 11.

After MS filed its complaint on September 8, 2020, a hearing was set for September 10. During the hearing, CBW provided a consent order from the Federal Deposit Insurance Corporation ("FDIC") barring CBW from all activity pertaining to foreign financial institution customers.[1]  CBW claims this order is the driving force behind terminating the relationship with MS.

## II. Preliminary Injunction Standard

Motions for temporary restraining orders are evaluated under the same standard as a preliminary injunction. *Sac & Fox Nation of Mo. v. LaFaver*, 905 F. Supp. 904, 907 (D. Kan. 1995). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also Wilderness Workshop v. BLM*, 531 F.3d 1220, 1223 (10th Cir. 2008) (noting "[b]ecause a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal"). The court will only grant a temporary restraining order or preliminary injunction after MS has shown: (1) a substantial likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) its threatened injury outweighs the harm a preliminary injunction may cause the opposing party; and (4) the injunction would not be adverse

---

[1] CBW provided copies of the consent order to the court and asked that the details of the order remain confidential. Without deciding whether the contents of the consent order should be sealed or otherwise kept confidential over the course of this litigation, the court will reference the consent order in general terms in this memorandum and order.

3

to the public interest. *Beltronics USA, Inc. v. Midwest Inventory Distrib.*, LLC, 562 F.3d 1067, 1070 (10th Cir. 2009).

Here, MS argues for a modified test that would make the first factor—substantial likelihood of success—more lenient. (Doc. 4.) However, after the Supreme Court's ruling in *Winter*, the Tenth Circuit noted "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1287 (10th Cir. 2016). Accordingly, MS has not met its burden under the proper standard and is denied injunctive relief.

## III. Analysis

### 1. Likelihood of Success

MS has failed to allege facts establishing a substantial likelihood of success on the merits. Throughout its complaint and accompanying memorandum, MS focuses on the *force majeure* and termination clauses of the Services Agreement. MS takes the position that because it invoked the *force majeure* clause due to the current pandemic the contract cannot be canceled until after the pandemic abates, or until MS finds a new bank. While the current pandemic likely meets the textual definition of a *force majeure* event, as contemplated in the Services Agreement, MS fails to identify any contractual obligation that it is unable to perform as a result of the pandemic. Instead, MS argues that the pandemic will hinder its ability to establish a relationship with a new bank to replace the services currently provided by CBW, and that any delay in finding a new bank will pose a grave risk to MS's business. However, nothing in the Services Agreement requires CBW to delay or forego its termination rights while MS finds a new American bank, nor does the Services Agreement impose on MS any obligations related to such a termination that would allow MS to forestall termination based on *force majeure*.

Indeed, MS and CBW are both sophisticated parties who agreed to the terms of their contract.[2] MS knew that CBW could terminate the agreement at will upon 30-days' prior written notice, which is exactly what happened. Thus, MS knew from the moment the Services Agreement was executed that it might find itself in the position of having to secure a replacement bank on 30-days' notice. Yet, MS allowed over two years to pass from the time the Services Agreement was executed on December 6, 2017 until CBW exercised its termination rights on July 24, 2020 without securing a relationship with an alternative bank. Only now that CBW seeks to end the relationship pursuant to the terms of the Services Agreement does MS attempt to avoid the consequences of the written contract by improperly invoking the *force majeure* clause. Since MS fails to identify any obligations under the Service Agreement that it cannot perform due to the pandemic, MS may not rely on the *force majeure* clause to prevent CBW from terminating the agreement. Accordingly, the court finds MS is unlikely to prevail on the merits.

### 2. Irreparable Harm

MS has demonstrated a likelihood of irreparable harm in the absence of an injunction. A harm is "irreparable" when monetary relief after a full trial would be inadequate. *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). The harm must be both "concrete and imminent." *Id.*; *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (holding movant "must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief"). "Numerous cases support the conclusion that loss of customers, loss of goodwill, and threats to a business' viability can constitute irreparable harm." *Zurn Constructors v. BF Goodrich Co.*, 685 F. Supp. 1172, 1181 (D. Kan. 1988).

---

[2] Plaintiffs also argue that CBW has breached its fiduciary duty. Generally, the "relationship between a bank and its depositor is that of creditor-debtor and not of a fiduciary." *Dugan v. First Nat'l Bank in Wichita*, 606 P.2d 1009, 1014 (1980). The court is not persuaded to deviate from the general rule and finds no fiduciary relationship.

MS argues that it could potentially be forced to shut down if it is unable to transfer its business to a new bank. During the Hearing, MS represented to the court that foreign exchange services constitute the primary revenue generator for the bank. Further, because of the current pandemic, the principals of MS have been unable to travel to the United States to pursue business relationships with replacement American banks. With its primary source of revenue impaired, MS is faced with the likelihood of losing customers and possibly being forced to shut down. With respect to the latter concern, MS explained at the Hearing that the Brazilian Central Bank enforces banking laws throughout the country. According to MS, if the Brazilian Central Bank determined that MS had effectively become inactive as a bank, then the Brazilian Central Bank could seize MS and its assets through some type of receivership in Brazil, or through other means. Based on the foregoing, the court finds MS would likely suffer irreparable harm in the absence of an injunction.

### 3. Balance of Harms

MS must also show that the balance of equities tips in favor of granting a TRO. *Winter*, 555 U.S. at 20. As noted above, MS is facing the possibility of losing its business if it is unable to find a new American bank. However, during the Hearing, CBW disclosed an FDIC order requiring CBW to terminate all its foreign financial institution customers. As a Brazilian bank, MS falls into this category of customers. During the Hearing, the court was informed that if CBW were to ignore the FDIC order it could face a wide-range of punishments—including having its charter pulled and losing its business. Nevertheless, the parties' representations at the hearing suggest that the FDIC is unlikely to pursue any enforcement of the consent order against CBW in the face of a court order to the contrary, and especially not anything as draconian as pulling CBW's

6

charter. In view of the competing harms faced by each of the parties, the court concludes the balance of equities tips slightly in favor of granting a TRO.

### 4. The Public Interest

Finally, MS advances the argument that the United States has an interest in Brazilian immigrants being able to send money to their family and friends back home. MS further alleges it plays a central role in the financial corridor between the countries and that by losing its account Brazilian immigrants throughout the country would lose the ability to wire money home. However, MS has not established that it is the only bank that provides money wiring services for individuals in the United States to send money to Brazil. Thus, to the extent that non-party Brazilian immigrants within the United States might have an interest in sending money back to Brazil that one could appropriately characterize as a public interest, there is no evidence suggesting that MS is the only bank that could provide those services.

On the other hand, there is a public interest in ensuring that the banking laws of the United States are obeyed and that nefarious foreign financial transactions are thwarted. *See Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 241-42 (1988). The FDIC is responsible for monitoring foreign financial transactions with U.S. banks in order to advance those public interests. *See Fed. Deposit Ins. Corp. v. Burger*, 631 F. Supp. 1141, 1143 (D. Kan. 1986). The FDIC is not a party to this litigation; nor does the court intend to suggest that MS's business is in any way unlawful. But the evidence currently before the court suggests that the FDIC had concerns with some of CBW's foreign financial transactions to the point that CBW and the FDIC entered into the consent order prohibiting CBW from engaging in further financial transactions with entities like MS. Thus, at this early stage of the proceedings, and on the current record, the court finds that injunctive relief

requested by MS would not be in the public interest because it would contravene the consent order between CBW and the non-party FDIC.

## IV. Conclusion

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Order (Doc. 3) is DENIED.

IT IS SO ORDERED this 23rd day of September, 2020.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE
